## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GABRIEL GRAY; WILLIAM TAYLOR;
DJJAMS LLC; FIREARMS POLICY
COALITION, INC., and SECOND
AMENDMENT FOUNDATION,

          Plaintiffs,

          v.

KATHY JENNINGS, Attorney General of
Delaware,
          Defendant.

C.A. No.

Plaintiffs Gabriel Gray ("Gray"), William Taylor ("Taylor"), DJJAMS LLC ("DJJAMS"), Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF"), by and through their attorneys, bring this action against Defendant Kathy Jennings, Attorney General of Delaware ("Defendant" or "Jennings") and allege as follows:

## <u>INTRODUCTION</u>

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. The Second Amendment is fully applicable to the States through the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring).

2.      In spite of the unambiguous text of the Constitution and binding Supreme Court precedents, including the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (June 23, 2022) ("*Bruen*"), on June 30, 2022, Delaware Governor John Carney signed into law House Bill 450 ("HB 450" or the "Bill"). HB 450 radically expanded the State of Delaware's statutes (the Delaware Code—cited herein as "Del.

C.") to ban, unconstitutionally and categorically, and under pain of severe criminal sanctions, the constitutionally protected conduct of possessing, self-manufacturing, transporting, importing, selling, transferring, purchasing, receiving, and lawfully using constitutionally protected arms in common use for lawful purposes.

3.      Defendant has and will continue to enforce the State's flat ban on the keeping and bearing of common semiautomatic firearms—tendentiously labeled "assault weapons"—by ordinary peaceable citizens, making it criminal for law-abiding citizens to exercise their fundamental right to keep and bear such arms (the "Ban"). *See* 11 Del. C. § 1465, *et seq*.

4.      Defendant's enforcement of Delaware's Ban on so-called "assault weapons" denies individuals who reside in or visit Delaware, including individual Plaintiffs, customers of Plaintiff DJJAMS, and members of FPC and SAF, their fundamental, individual right to keep and bear common arms.

5.      The statutes enacted in HB 450, combined with Delaware's ban on self-manufacturing constitutionally protected firearms,[1] creates a total and complete ban on a common and popular category of arms in violation of the Constitution.

6.      In *Bruen*, the Supreme Court expressly rejected all interest balancing and the Third Circuit's prior "two-step" approach in the context of Second Amendment claims. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct., at 2127. Rather, "*Heller* … demands a test rooted in the Second Amendment's text, as informed

---

[1] Also challenged by Plaintiff FPC on behalf of its members through undersigned counsel; *see Rigby v. Jennings*, D. Del. C.A. No. 21-1523-MN.

by history." *Id.*

7.      It is patently clear that *Bruen* did not create a new test but instead applied the very test the Court established in *District of Columbia v. Heller*, 554 U.S. 570, in 2008. "The test that [the Court] set forth in *Heller* and apply today [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.

8.      "*Helle*r's methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id.*, at 2128-29.

9.      The plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in ("keep and bear arms") and the arms they wish to keep and bear because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 142 S. Ct., at 2132. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S. Ct., at 2126.

10.      *Heller* has already established the relevant contours of the tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. But arms that are in common use—such as those banned by Delaware—cannot be both dangerous and unusual. And to be sure, the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct.,

at 2132 (quoting *Heller*, 554 U. S., at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (citations omitted).

11.      "Semiautomatic weapons," such as those proscribed under Delaware's Ban, "traditionally have been widely accepted as lawful possessions." *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (quoting *Staples v. United States*, 511 U.S. 600, 612, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)) (cleaned up) (pet. for reh'g en banc pending). And "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. *Cf. Caetano v. Massachusetts*, 577 U. S. 411, 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per curiam) (stun guns)." *Id*.

12.      In this case, the analysis is straightforward: The Plaintiffs may not be prohibited from exercising their right to keep and bear arms. The Second Amendment's text covers the conduct the Plaintiffs wish to engage in and the arms they wish to acquire and possess. The arms the Plaintiffs wish to acquire and possess are not dangerous and unusual today. Moreover, there is no analogous history supportive of Delaware's Ban. Thus, under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs must prevail.

13.      Plaintiffs therefore bring this challenge to vindicate their rights, and to immediately and permanently enjoin enforcement of Delaware's Ban on, *inter alia*, the possession, sale, transfer, transportation, and importation of constitutionally protected arms.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

15.     This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Delaware.

## PARTIES

17.     Plaintiff Gray is a natural person and a citizen of the State of Delaware, residing in Sussex County, Delaware.

18.     Plaintiff Taylor is a natural person and a citizen of the State of Delaware, residing in Sussex County, Delaware.

19.     Plaintiff DJJAMS is a Delaware limited liability company and firearms retailer located in New Castle County, Delaware.

20.     Plaintiff FPC is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada.

21.     Plaintiff SAF is a 501(c)(3) non-profit organization incorporated under the laws of Washington with a place of business in Bellevue, Washington.

22.     Defendant Jennings is the Attorney General of the State of Delaware, "the State's chief law enforcement officer."[2] As Attorney General, Defendant Jennings supervises, directs, and

---

[2] *See* https://attorneygeneral.delaware.gov/about/.

Case 1:22-cv-01500-UNA   Document 1   Filed 11/16/22   Page 6 of 29 PageID #: 6


controls the Department of Justice of the State of Delaware. *See* 29 Del. C. § 2502. Thus, Defendant Jennings is wholly or partially responsible for overseeing, implementing, and enforcing Delaware's Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same. Among the powers conferred by the Delaware General Assembly upon the Attorney General is the authority "to have charge of all criminal proceedings." 29 Del. C. § 2504(6). Defendant Jennings is sued in her official capacity as Attorney General of the State of Delaware.

## STATEMENT OF FACTS

### *The Right to Keep and Bear Arms*

23.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed." U.S. CONST. amend. II (emphasis added).

24.     Incorporated against the states through the Fourteenth Amendment (*McDonald*, 561 U.S. at 750), the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

### *Delaware's Unconstitutional Ban on So-Called "Assault Weapons"*

25.     In HB 450, Delaware added definitions at 11 Del. C. § 1465 "for purposes of this section and § 1466 and § 1467" which set forth the various terms relating to the State's Ban on so-called "assault weapons."

26.     Under 11 Del. C. § 1465(1), "ammunition feeding device" means any magazine, belt, drum, feed strip, or similar device that holds ammunition for a firearm.

27.     Under 11 Del. C. § 1465(2), "assault long gun" means any of the following or a copy, regardless of the producer or manufacturer:

a.     American Arms Spectre da Semiautomatic carbine.

b.     Avtomat Kalashnikov semiautomatic rifle in any format, including the AK-47 in all forms.

c.     Algimec AGM-1 type semi-auto.

d.     AR 100 type semi-auto.

e.     AR 180 type semi-auto.

f.     Argentine L.S.R. semi-auto.

g.     Australian Automatic Arms SAR type semi-auto.

h.     Auto-Ordnance Thompson M1 and 1927 semi-automatics.

i.     Barrett light .50 cal. semi-auto.

j.     Beretta AR70 type semi-auto.

k.     Bushmaster semi-auto rifle.

l.     Calico models M-100 and M-900.

m.     CIS SR 88 type semi-auto.

n.     Claridge HI TEC C-9 carbines.

o.     Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle.

p.     Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2.

q.     Dragunov Chinese made semi-auto.

r.     Famas semi-auto (.223 caliber).

s.     Feather AT-9 semi-auto.

t.      FN LAR and FN FAL assault rifle.

u.      FNC semi-auto type carbine.

v.      F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun.

w.      Steyr-AUG-SA semi-auto.

x.      Galil models AR and ARM semi-auto.

y.      Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3.

z.      Holmes model 88 shotgun.

aa.     Manchester Arms "Commando" MK-45, MK-9.

bb.     Mandell TAC-1 semi-auto carbine.

cc.     Mossberg model 500 Bullpup assault shotgun.

dd.     Sterling Mark 6.

ee.     P.A.W.S. carbine.

ff.     Ruger mini-14 folding stock model (.223 caliber).

gg.     SIG 550/551 assault rifle (.223 caliber).

hh.     SKS with detachable magazine.

ii.     AP-74 Commando type semi-auto.

jj.     Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, and M1A, excluding the M1 Garand.

kk.     Street sweeper assault type shotgun.

ll.     Striker 12 assault shotgun in all formats.

mm.     Unique F11 semi-auto type.

nn.     Daewoo USAS 12 semi-auto shotgun.

oo.     UZI 9mm carbine or rifle.

pp.   Valmet M-76 and M-78 semi-auto.

qq.   Weaver Arms "Nighthawk" semi-auto carbine.

rr.   Wilkinson Arms 9mm semi-auto "Terry."

28.   Under 11 Del. C. § 1465(3), "assault pistol" means any of the following or a copy, regardless of the producer or manufacturer:

a.   AA Arms AP-9 pistol.

b.   Beretta 93R pistol.

c.   Bushmaster pistol.

d.   Claridge HI-TEC pistol.

e.   D Max Industries pistol.

f.   EKO Cobra pistol.

g.   Encom MK-IV, MP-9, or MP-45 pistol.

h.   Heckler and Koch MP5K, MP7, SP-89, or VP70 pistol.

i.   Holmes MP-83 pistol.

j.   Ingram MAC 10/11 pistol and variations, including the Partisan Avenger and the SWD Cobray.

k.   Intratec TEC-9/DC-9 pistol in any centerfire variation.

l.   P.A.W.S. type pistol.

m.   Skorpion pistol.

n.   Spectre double action pistol (Sile, F.I.E., Mitchell).

o.   Stechkin automatic pistol.

p.   Steyer tactical pistol.

q.   UZI pistol.

     r.     Weaver Arms Nighthawk pistol.

     s.     Wilkinson "Linda" pistol.

29.     Under 11 Del. C. § 1465(4), "assault weapon" means any of the following or a copy, regardless of the producer or manufacturer:

     a.     An assault long gun.

     b.     An assault pistol.

     c.     A copycat weapon.

30.     Under 11 Del. C. § 1465(5), "completed a purchase" means that the purchaser completed an application, passed a background check, and has a receipt or purchase order for the assault weapon, without regard to whether the purchaser has actual physical possession of the assault weapon. If receipt of the assault weapon will not occur until more than 1 year after July 1, 2023, it is not a completed purchase.

31.     Under 11 Del. C. § 1465(6), "Copycat weapon" means any of the following:

     a.  A semiautomatic, centerfire rifle that can accept a detachable magazine and has at least 1 of the following:

         i.     A folding or telescoping stock.

         ii.     Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.

         iii.     A forward pistol grip.

         iv.     A flash suppressor.

         v.     A grenade launcher or flare launcher.

b.   A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

c.   A semiautomatic pistol that can accept a detachable magazine and has at least 1 of the following:

    i.   An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip.

    ii.   A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer.

    iii.   A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel.

    iv.   A second hand grip.

d.   A semiautomatic shotgun that has both of the following:

    i.   A folding or telescoping stock.

    ii.   Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.

e.   A semiautomatic shotgun that has the ability to accept a detachable magazine.

f.   A shotgun with a revolving cylinder.

g.   A semiautomatic pistol with a fixed magazine that can accept more than 17 rounds.

h.   A semiautomatic, centerfire rifle that has a fixed magazine that can accept more than 17 rounds.

32.   Under 11 Del. C. § 1465(7), "detachable magazine" means an ammunition feeding

device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

33.     Under 11 Del. C. § 1465(8), "family" means as defined in 10 Del. C. § 901.

34.     Under 11 Del. C. § 1465(9), "flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

35.     Under 11 Del. C. § 1465(10), "grenade launcher" means a device designed to fire, launch, or propel a grenade.

36.     Under 11 Del. C. § 1465(11), "secure storage" means a firearm that is stored in a locked container or equipped with a tamper resistant mechanical lock or other safety device that is properly engaged so as to render the firearm inoperable by a person other than the owner or other lawfully authorized user.

37.     Under 11 Del. C. § 1465(12), "secure storage" means a firearm that is stored in a locked container or equipped with a tamper-resistant mechanical lock or other safety device that is properly engaged so as to render the firearm inoperable by a person other than the owner or other lawfully authorized user.[3]

38.     Under 11 Del. C. § 1465(13), "shooting range" means any land or structure used and operated in accordance with all applicable laws and ordinances for the shooting of targets for training, education, practice, recreation, or competition.

39.     Under 11 Del. C. § 1466(a), unless exempt from the law under provisions not applicable in this case, "it is unlawful for a person to" "[t]ransport an assault weapon into this State" or to "[m]anufacture, sell, offer to sell, transfer, purchase, receive, or possess an assault

---

[3] 11 Del. C. § 1465(12) appears to be an inadvertent, nearly identical duplication of § 1465(11).

weapon.

### Penalties for Violating Delaware's Unconstitutional Ban

40.     A person is guilty of a class D felony when that person transports or imports an "assault weapon" into Delaware, 11 Del. C. § 1466(a)(1), or manufactures, sells, offers to sell, transfers, purchases, receives, or possesses an assault weapon, 11 Del. C. § 1466(a)(2).

41.     A Class D felony is punishable by up to 8 years in prison (11 Del. C. § 4205(b)(4), *supra*).

42.     A conviction would result in the lifetime disqualification of an individual's right to own and possess firearms and ammunition. *See* 18 U.S.C. § 922(g)(1).

### Delaware Unconstitutionally Bans Protected Arms In Common Use

43.     Semiautomatic firearms "traditionally have been widely accepted as lawful possessions." *See Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle).

44.     Rifles built on an AR-style platform are a paradigmatic example of the type of arms Delaware now bans. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. And according to industry sources, even ten years ago more than one out of every five firearms sold in recent years was a rifle of the type banned by Delaware. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013) at 11. *See also* Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-

over-24-million-msrs-in-circulation/; Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (March 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.

45.     The banned semiautomatic firearms, like all other semiautomatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *See Staples*, 511 U.S. at 602 n.1. What is more, the designation "assault weapons" is a complete misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

46.     A comparison to firearms used by the military demonstrates just how disingenuous the "assault weapon" moniker is. While an AR-15 can only fire as often as a person can pull its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire between 750 and 1,000 rounds per minute, Squad Automatic Weapon (SAW), M249 Light Machine Gun, MILITARY ANALYSIS NETWORK, https://bit.ly/3tsQGtd, and "heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), M61A1/M61A2 20mm Automatic Gun, MILITARY ANALYSIS NETWORK, https://bit.ly/3ttnemV.

47.     Unlike these "weapons of war," central among the common uses of firearms banned in Delaware is defense of self in the home. For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has

sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target.

48.     Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after passing through walls and other objects, and pose substantially greater risk to unintended targets in the home.

49.     An AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm to rely on in a self-defense encounter.

50.     Like the AR-15 generally, the specific features banned by Delaware aid home defense. A flash suppressor, for example, not only reduces the chances that a home invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994). Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id*. at 398–99, as well as enabling safe storage of defense instruments in accessible spaces. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

51.     Folding and telescoping stocks also increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id*. at 398–99 26.  Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id*. at 396.

52.     Most all common semiautomatic firearms, including those banned under Delaware law, can accept a detachable magazine. Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms,

including the AR-15, they are required to remedy malfunctions safely and quickly.

53.     Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995); *see also* English, *National Firearms Survey*, *supra* at 9 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

54.     Other common, lawful uses of the banned firearms are hunting and sport. At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning semiautomatic firearms like those banned by Delaware.

55.     Here again, the banned features of firearms mischaracterized as "assault weapons" serve lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks also ease carrying over long distances while hunting. Both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry. Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions. Additionally, flash suppressors promote accuracy in target shooting and hunting (especially at dawn), as well as mitigate against temporary blindness when using a

firearm in self-defense.

56.     By contrast, one use that is <u>not</u> common for so-called "assault weapons" is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." This has long been true. *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'"). Indeed, according to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. *See* Expanded Homicide Table 8, Crime in the United States (FBI 2019), https://bit.ly/3HdolNd.

57.     The arms banned as "assault weapons" under Delaware's laws are common in all respects: 1) They are common categorically, as they are all functionally semiautomatic in their operation; 2) they are common characteristically, as they are all popular configurations of arms (*e.g.*, rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and 3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

58.     There is no constitutionally relevant difference between a semiautomatic handgun, shotgun, and rifle. While some exterior physical attributes may differ—wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. having muzzle devices, different barrel lengths, etc.—they are, in all relevant respects, the same.

59.     Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of

the trigger until ammunition is exhausted or the firearm or feeding device malfunctions. They are all common under the same jurisdictional analysis. Further, they are all subject to the same constitutionally relevant history under which Delaware's Ban is clearly and categorically unconstitutional.

60.     And while some distinct AR-15 rifle models, like those used for competition, are not sold in large numbers by themselves, those too are protected for the same reasons that all semi-automatic rifles, shotguns, and handguns are, just as the latest-generation Glock and Sig Sauer handguns, for example, will be once they are available for sale. The same goes for firearms prohibited under Delaware's Ban based on semiautomatic function and characteristics and their evolutionary and technological successors

61.     Just like the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" is not merely wrong, but "bordering on the frivolous" (*Heller*, 554 U.S. at 582), the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (internal citations omitted).

62.     The fact that Delaware's laws may act to ban thousands of discrete configurations of common semi-automatic arms held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller* and *Bruen*.

63.     Delaware's Ban on possessing, acquiring, manufacturing, importing, transporting, selling, purchasing, receiving, and lawfully using "assault weapons" is, therefore, a ban on keeping

and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

64.     *Bruen* confirms that the Second Amendment's plain text covers the activity at issue—possession of a bearable arm. That is because, reiterating what was said in *Heller*, *Bruen* states that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id*. at 2132 (emphasis added). *Bruen* further confirms that the *Heller* Court already has conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection and therefore cannot be banned.

65.     The arms banned as "assault weapons" under Delaware's laws are not both dangerous *and* unusual.

66.     In order for a ban of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is "dangerous and unusual." *Id*. at 2143. It follows that types of arms that are in "common use today" simply cannot be banned. *Id*. These principles decide this case. Once it is determined that Delaware's laws ban arms that are in common use, it follows that the law is unconstitutional — period.

### Delaware's Laws Violate the Second and Fourteenth Amendments

67.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

68.     The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

69.     The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring).

70.     "The very enumeration of the right [to keep and bear arms] takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. 570, 634 (2008) (emphasis in original).

71.     "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634–35.

72.     For this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582 (citations omitted).

73.     Because Delaware bans arms in common use, the Ban violates the Second and Fourteenth Amendments.

74.     In order to justify a law that affects Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition. *Bruen*, 2022 WL 2251305, at *9. As a matter of law, any statute or regulation that bans ownership of firearms in common use for lawful purposes like self-defense is inconsistent with this nation's history and tradition, and thus violates the Second Amendment. *Id*. at 12; *Heller*, 554 U.S. at 624.

75.     The firearms at issue in this case are the sorts of bearable arms in common use for

lawful purposes that law-abiding Americans possess at home by the tens of millions. And they are, moreover, exactly what they would bring to service in militia duty, should such be necessary.

76.     In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id*. at 592.

77.     When seconds count, the police may be minutes or hours away, if they come at all — they certainly have no obligation to. *See*, *e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

78.     The People have a constitutional right to make and make use of common firearms for effective self-defense and not to be disarmed by the enactment and enforcement of bans like the one at issue here.

79.     Assuming ordinary citizens are not disqualified from exercising Second Amendment rights, the State *must* permit them to keep and bear the common firearms, now banned by Delaware, for lawful purposes.

80.     The Second Amendment is an "unqualified command." *Bruen*, 2022 WL 2251305, at *11. When a law — like Delaware's Ban at issue here — prevents citizens from owning firearms that are in common use for lawful purposes, then the law violates the Second Amendment. *Id*. It cannot be justified by reference to any countervailing governmental interest. *Id*. Moreover, considerations of whether such a law puts a "serious," "substantial," or "onerous" (or any other qualifier) burden on the Second Amendment are immaterial.

81.     The right to keep and bear common firearms guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

21

82.     The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Id*. at 636. Yet, this is precisely how Delaware's laws operate, completely shutting out ordinary, law-abiding citizens from exercising their rights in Delaware.

### Facts Relating to All Plaintiffs

83.     Unless and until enjoined, Defendant's active administration, implementation, and enforcement of Delaware's Ban on the possession, acquisition, transport, or manufacture, sale, offering to sell, transfer, purchase, and receipt of "assault weapons" has violated and will continue to violate the Plaintiffs' fundamental, individual right to keep and bear arms.

### Facts Relating to Plaintiff Gray

84.     Plaintiff Gray is a resident of Sussex County, Delaware.

85.     Plaintiff Gray is a peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition.

86.     Plaintiff Gray is in the process of applying for a concealed carry permit for Delaware.

87.     Plaintiff Gray is not a licensed firearms manufacturer, importer, or dealer.

88.     Plaintiff Gray is a member of Plaintiff FPC.

89.     Plaintiff Gray wishes and intends to acquire, possess, and lawfully use arms Delaware bans as "assault weapons" after June 30, 2022, and would do so but for his reasonable fear of prosecution as a result of Defendant's active enforcement of the State's Ban on, *inter alia*, acquiring and possessing common semiautomatic firearms Delaware considers to be "assault weapons."

*Facts Relating to Plaintiff Taylor*

90.     Plaintiff Taylor is a resident of Sussex County, Delaware.

91.     Plaintiff Taylor is a peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition.

92.     Plaintiff is in the process of applying for a concealed carry permit for Delaware.

93.     Plaintiff Taylor is not a licensed firearms manufacturer, importer, or dealer.

94.     Plaintiff Taylor is a member of Plaintiff FPC.

95.     Plaintiff Taylor wishes and intends to acquire, possess, and lawfully use arms Delaware bans as "assault weapons" after June 30, 2022, and would do so but for his reasonable fear of prosecution as a result of Defendant's active enforcement of the State's Ban on, *inter alia*, acquiring and possessing common semiautomatic firearms Delaware considers to be "assault weapons."

*Facts Relating to Plaintiff DJJAMS*

96.     Plaintiff DJJAMS is federally licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as a Federal Firearms Licensee ("FFL"), legally able to sell and transfer firearms in Delaware.

97.     Many customers and prospective customers of Plaintiff DJJAMS are interested in, have, and continue to seek to purchase constitutionally protected firearms banned by Delaware.

98.     But for Delaware's Ban on common semiautomatic firearms and Defendant's active enforcement thereof, which Plaintiff DJJAMS reasonably fears, Plaintiff DJJAMS would make available for sale and transfer to its customers all of the constitutionally protected semiautomatic firearms on the market that are available and common outside of Delaware, and which DJJAMS sold and transferred before enactment of Delaware's Ban, and sell and transfer

them to their adult customers who are not disqualified from exercising Second Amendment rights.

99.     As a result of Delaware's Ban, DJJAMS has had to turn away prospective customers seeking to purchase and possess arms subject to the Ban and has experienced a notable decline in firearms sales as well as firearm transfer requests and the associated fees.

### *Facts Relating to Plaintiff FPC*

100.     The purposes of Plaintiff FPC include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom.

101.     Plaintiff FPC has members in Delaware, including plaintiffs herein, who wish to lawfully keep and bear arms banned in Delaware.

102.     Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

103.     FPC represents its members who include gun owners, prospective gun owners, self-manufacturers, retailers of firearm parts, tools, and supplies, and others who engage in the right to keep and bear arms, and brings this action on behalf of them, including plaintiffs herein.

104.     Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

105.     FPC's Delaware resident members, including plaintiffs herein, and those who reside outside of Delaware but who wish to keep and bear arms in Delaware, have been and will continue to be adversely and directly harmed by Defendant's administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under Delaware's Ban challenged herein.

106.    Like Plaintiffs Gray and Taylor, many of Plaintiff FPC's Delaware resident members desire and intend to acquire, possess, and lawfully use semiautomatic firearms banned by Delaware as "assault weapons" but which are otherwise in common use for self-defense and other lawful purposes.

107.    Based on the threat of felony prosecution by and through Delaware's Ban that Defendant is actively enforcing, FPC's Delaware resident members have been prevented from, *inter alia*, possessing, acquiring, importing, transporting, selling, receiving or lawfully using banned "assault weapons."

108.    FPC reasonably fears the prosecution of its Delaware resident members by and through Defendant's administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

### Facts Relating to Plaintiff SAF

109.    The purposes of Plaintiff SAF include promoting a better understanding of the nation's Constitutional heritage to privately own and possess firearms. To that end, SAF carries on educational and legal action programs designed to better inform the public about the debate concerning gun control.

110.    SAF represents its members who include gun owners, prospective gun owners, self-manufacturers, retailers of firearm parts, tools, and supplies, and others who engage in the right to keep and bear arms, and brings this action on behalf of them, including plaintiffs herein.

111.    SAF's Delaware resident members, including plaintiffs herein, and those who reside outside of Delaware but who wish to keep and bear arms in Delaware, have been and will continue to be adversely and directly harmed by Defendant's administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein

25

and will otherwise remain so adversely and directly affected under Delaware's Ban challenged herein.

112.    Like Plaintiffs Gray and Taylor, SAF's Delaware resident members desire and intend to acquire, possess, and lawfully use semiautomatic firearms banned by Delaware as "assault weapons" but which are otherwise in common use for self-defense and other lawful purposes.

113.    Based on the threat of felony prosecution by and through Delaware's Ban that Defendant is actively enforcing, SAF's Delaware resident members have been prevented from, *inter alia*, possessing, acquiring, importing, transporting, selling, receiving or lawfully using banned "assault weapons."

114.    SAF reasonably fears the prosecution of its Delaware resident members by and through Defendant's administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

<u>**COUNT ONE**</u>

**Violation of the United States Constitution**
**Second and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(All Plaintiffs v. Defendant)**

115.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

116.    The Second Amendment to the Constitution of the United States forbids government actions infringing the right to keep and bear arms. It applies to Defendant by virtue of the Fourteenth Amendment to the Constitution of the United States.

117.    There is an actual and present controversy between the parties.

118.    The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of the states their fundamental right to keep and bear

arms, both in the home and in public.

119.    The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

120.    The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, possess, purchase, receive, transport, and lawfully use common firearms for all lawful purposes, including self-defense.

121.    Delaware bans firearms that are commonly used for lawful purposes, grounding this Ban on an arbitrary combination of features that do not make a firearm more powerful or dangerous. No adequate basis exists to restrict such firearms, which fire only once per trigger pull like all other semiautomatic firearms.

122.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

123.    Defendant, acting under color of state law at all relevant times, has deprived the fundamental constitutional rights of persons in Delaware, Plaintiffs Gray, Taylor, customers of Plaintiff DJJAMS, and all similarly situated members of Plaintiff FPC, through enforcement of the State's laws banning the self-manufacture, transportation, importation, sale, transfer, receipt, possession, and use of constitutionally protected arms.

124.    Delaware's Ban on, *inter alia*, the self-manufacturing, acquiring, possessing, and selling of so-called "assault weapons" inflicts irreparable harm on Plaintiffs by prohibiting possession of property and conduct protected under the Second Amendment individual right to keep and bear arms.

125.    Plaintiffs lack an adequate remedy at law for this burden on their Second

Amendment rights, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendant. The public interest favors enjoining unconstitutional statutes, including those underlying Delaware's Ban on, *inter alia*, the self-manufacturing, acquiring, possessing, and selling of so-called "assault weapons."

126.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Second Amendment, Plaintiffs and all similarly situated Delaware resident and visitor members of FPC have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.

127.    Thus, injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of their Second Amendment rights.

128.    Defendant, having acted under color of law, policy, custom or practice to subject Plaintiffs to the deprivation of their right to keep and bear arms, is liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]" For all the reasons asserted herein, Defendant has acted in violation of, and continues to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, as follows:

a)      A declaratory judgment that Delaware's Ban on common semiautomatic firearms and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Gray, Taylor, all similarly situated members of Plaintiffs FPC and SAF, and customers of Plaintiff DJJAMS from exercising their fundamental right to keep and bear arms, as

guaranteed under the Second and Fourteenth Amendments to the United States Constitution, and are therefore unconstitutional;

b)      A preliminary and permanent injunction prohibiting Defendant, and Defendant's respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing Delaware's Ban on the semiautomatic firearms at issue and all related regulations, policies, and/or customs designed to enforce or implement the same;

c)      Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d)      Any and all other and further legal and equitable relief against Defendant as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.


Dated: November 16, 2022          **GELLERT SCALI BUSENKELL & BROWN LLC**

                                  */s/ Bradley P. Lehman*
                                  Bradley P. Lehman (No. 5921)
                                  1201 N. Orange Street, Suite 300
                                  Wilmington, DE 19801
                                  P: (302) 425-5800
                                  E: blehman@gsbblaw.com

                                  *Counsel to Plaintiffs*