## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC; FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY JENNINGS, Attorney General of Delaware,<br>Defendant. | C.A. No. 1:22-cvc-01500-UNA |

**OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION**

Bradley P. Lehman (No. 5921)
**GELLERT SCALI BUSENKELL & BROWN LLC**
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 1

    I.   Delaware House Bill 450 (HB 450) ...................................................................................... 1

      A.  The New Definitions Created by HB 450 ......................................................................... 1

    II.  Impact on Plaintiffs ............................................................................................................... 2

ARGUMENT .............................................................................................................................. 2

    I.   Plaintiffs are Likely to Succeed on the Merits of their Second and Fourteenth Amendment

Claim .......................................................................................................................................... 3

      A.  The Right to Keep and Bear Arms .................................................................................... 3

      B.  Delaware Unconstitutionally Bans Protected Arms and Components in Common Use.. 5

    II.  Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction ........ 11

    III. The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief ............... 11

    IV. The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount ....... 12

    V.  The Court Should Enter Final Judgment Awarding a Permanent Injunction .................... 12

CONCLUSION .......................................................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013)..................................................................................................11, 12

*Board of Educ. v. F.C. ex rel. R.C.*,
  2 F. Supp. 2d 637 (D.N.J. Apr. 22, 1998) ...............................................................................12

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 1998) ...................................................................................................12

*DeLeon v. Susquehanna Cnty. Sch. Dist.*,
  747 F.2d 149 (3d Cir. 1984)......................................................................................................12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).........................................................................................................3, 4, 10

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...................................................................................................11

*Lewis v. Kugler*,
  446 F.2d 1343 (3d Cir. 1971).....................................................................................................11

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)....................................................................................................................3

*New York State Rifle and Pistol Association v. Bruen*,
  142 S. Ct. 2111 (June 23, 2022).................................................................................3, 4, 10, 11

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017).......................................................................................................2

*Staples v. United States*,
  511 U.S. 600 (1994)....................................................................................................................5

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) (Thomas, J., dissenting) ...........................................................................6

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991).....................................................................................................12

*Wrenn v. Dist. of Columbia*,
  864 F.3d 650 (D.C. Cir. 2017)............................................................................................12, 13

**Constitutions, Statutes, and Rules**

United States Constitution

U.S. CONST. amend. II................................................................................................................3

United States Code

18 U.S.C. § 922(g)(1) ..............................................................................................................2

FED. R. CIV. P.

Fed. R. Civ. P. 65..................................................................................................................12

Delaware Code ("Del. C.")

11 Del. C. § 1465 ....................................................................................................................1

11 Del. C. § 1466 ....................................................................................................................2

11 Del. C. § 4205(b)(4)...........................................................................................................2

**Other Authorities**

WILLIAM ENGLISH, 2021 *National Firearms Survey: Updated Analysis Including
     Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw .....................................5, 8

FEDERAL BUREAU OF INVESTIGATION, *Expanded Homicide Table 8, Crime in the
     United States* (2019), https://bit.ly/3HdolNd ..................................................................9

GARY KLECK, MARC GERTZ, *Armed Resistance to Crime: The Prevalence and
     Nature of Self-Defense with a Gun* ....................................................................................8

DAVID B. KOPEL, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J.
     CONTEMP. L. 381, 397 (1994) ............................................................................................7

GARY KLECK, *Targeting Guns: Firearms and Their Control* 112 (1997).....................................9

MILITARY ANALYSIS NETWORK, *M249 Light Machine Gun*, https://bit.ly/3tsQGtd .......................6

MILITARY ANALYSIS NETWORK, *M61A1/M61A2 20mm Automatic Gun*
     https://bit.ly/3ttnemV ........................................................................................................6

FRANK MINITER, THE FUTURE OF THE GUN, at 35 (2014) ...........................................................6, 7

NAT'L SHOOTING SPORTS FOUND., INC., *Commonly Owned: NSSF Announces
     Over 24 Million MSRs in Circulation* (July 20, 2022),
     https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-
     million-msrs-in.......................................................................................................................5

NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (2013) .........................5

NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (March 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; ..................................................................................................................5

NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; ..................................................................................................5

NAT'L SHOOTING SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf ...................................................................................................................5

## INTRODUCTION

On June 30, 2022, Delaware Governor John Carney signed into law House Bill 450 ("HB 450"). HB 450 radically expanded the State of Delaware's statutes (the Delaware Code—cited herein as "Del. C.") to ban, unconstitutionally and categorically, and under pain of severe criminal sanctions, the constitutionally protected conduct of possessing, purchasing, transporting, importing, selling, transferring, self-manufacturing, receiving, and lawfully using constitutionally protected arms in common use for lawful purposes – tendentiously labeled "assault weapons." HB 450 makes it criminal in the State of Delaware for law-abiding citizens to exercise their fundamental right to keep and bear such arms. Defendant's enforcement of Delaware's Ban on so-called "assault weapons" denies individuals who reside in or visit Delaware, including individual Plaintiffs, customers of Plaintiff DJJAMS, and members of FPC and SAF, their fundamental, individual right to keep and bear common arms.

Plaintiffs Gabriel Gray ("Gray"), William Taylor ("Taylor"), DJJAMS LLC ("DJJAMS"), Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF"), together with similarly situated Delaware citizens and FPC and SAF members, face imminent and irreparable harm as a result of the Ban. Accordingly, Plaintiffs respectfully submit this brief in support of their motion for a preliminary and permanent injunction.

## BACKGROUND

### I.     Delaware House Bill 450 (HB 450)

#### A.  The New Definitions Created by HB 450

In HB 450, Delaware added definitions at 11 Del. C. § 1465 "for purposes of this section and § 1466 and § 1467" which set forth the various terms relating to the State's Ban on so-called "assault weapons." In the interest of brevity, the voluminous list of banned arms and the definitions describing firearm features that Defendant contends create "assault weapons," as more fully set

forth in paragraphs 26-39 of Plaintiffs' Complaint (Dkt. No. 1), are reproduced on Exhibit "A" hereto. Under 11 Del. C. § 1466(a), unless exempt from the law under provisions not applicable in this case, "it is unlawful for a person to" "[t]ransport an assault weapon into this State" or to "[m]anufacture, sell, offer to sell, transfer, purchase, receive, or possess an assault weapon."

A person is guilty of a class D felony when that person transports or imports an "assault weapon" into Delaware, 11 Del. C. § 1466(a)(1), or manufactures, sells, offers to sell, transfers, purchases, receives, or possesses an assault weapon, 11 Del. C. § 1466(a)(2). A Class D felony is punishable by up to 8 years in prison (11 Del. C. § 4205(b)(4)). A conviction would result in the lifetime disqualification of an individual's right to own and possess firearms and ammunition. *See* 18 U.S.C. § 922(g)(1).

## II.   Impact on Plaintiffs

Defendant's enactment and enforcement of the provisions at issue in HB 450 inflicts irreparable harm upon individual plaintiffs Gray and Taylor, upon firearms retailer plaintiff DJJAMS, and upon institutional plaintiffs FPC and SAF, by denying the individual plaintiffs, DJJAMS and its Delaware customers, and members of FPC and SAF in Delaware, their fundamental right to keep and bear arms in common use for lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution. Given that the Ban is presently in effect, the need for injunctive relief is urgent.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits[1] and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly*

---

[1] Establishing a likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d 173 at 179.

*v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. Here, all four factors favor preliminarily enjoining Defendant from enforcing Delaware's Bans.

**I.    Plaintiffs are Likely to Succeed on the Merits of their Second and Fourteenth Amendment Claim**

**A.  The Right to Keep and Bear Arms**

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, *shall not be infringed*." U.S. CONST. amend. II (emphasis added). Incorporated against the states through the Fourteenth Amendment (*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)), the Second Amendment guarantees "an individual right to keep and bear arms," which is "a fundamental constitutional right guaranteed to the people." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Moreover, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111, 2132 (June 23, 2022). Indeed, "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

In its June 2022 decision in *Bruen*, the U.S. Supreme Court expressly rejected all interest balancing and the Third Circuit's prior "two-step" approach in the context of Second Amendment claims. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

3

142 S. Ct., at 2127. Rather, "*Heller* … demands a test rooted in the Second Amendment's text, as informed by history." *Id.* Accordingly, the Delaware General Assembly's justification of HB 450 with claims that the "General Assembly has a compelling interest to ensure the safety of Delawareans" and that the banned arms, which are in common use, "have no place in civilian life" are entitled to no deference.

The plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in ("keep and bear arms") and the arms they wish to keep and bear because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 142 S. Ct., at 2132. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S. Ct., at 2126.

*Heller* has already established the relevant contours of the tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. But arms that are in common use—such as those banned by Delaware— *cannot* be both dangerous and unusual. And to be sure, the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct., at 2132 (quoting *Heller*, 554 U. S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (citations omitted).

## B. Delaware Unconstitutionally Bans Protected Arms and Components in Common Use

Semiautomatic weapons such as those proscribed under Delaware's Ban "traditionally have been widely accepted as lawful possessions." *See Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle). Rifles built on an AR-style platform are a paradigmatic example of the type of arms Delaware now bans. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* WILLIAM ENGLISH, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. And according to industry sources, even ten years ago more than one out of every five firearms sold in recent years was a rifle of the type banned by Delaware. NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (2013) at 11; *see also* NAT'L SHOOTING SPORTS FOUND., INC., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in circulation/; NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (March 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; NAT'L SHOOTING SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.

The banned semiautomatic firearms, like all other semiautomatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *See Staples*, 511 U.S. at 602 n.1. What is more, the designation "assault weapons" is a complete misnomer, "developed by anti-gun

publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). A comparison to firearms used by the military demonstrates just how disingenuous the "assault weapon" moniker is. While an AR-15 can only fire as often as a person can pull its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire between 750 and 1,000 rounds per minute, Squad Automatic Weapon (SAW), M249 Light Machine Gun, MILITARY ANALYSIS NETWORK, https://bit.ly/3tsQGtd, and "heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), M61A1/M61A2 20mm Automatic Gun, MILITARY ANALYSIS NETWORK, https://bit.ly/3ttnemV.

Unlike these "weapons of war," central among the common uses of firearms now banned in Delaware is defense of self in the home. For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. *See Modern Sporting Rifle Comprehensive Consumer Report*, *supra* (noting that self/home-defense is the second most important reason that American reported for owning AR-style firearms, second only to recreational target shooting).

Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after passing through walls and other objects, and pose substantially greater risk to unintended targets in the home. *See* FRANK MINITER, THE FUTURE OF THE GUN, at 35 (2014) ("ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular. . . . It's also easy to shoot and has little

6

recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves. Also, its .223 caliber makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls."). An AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm to rely on in a self-defense encounter. Like the AR-15 generally, the specific features banned by Delaware aid home defense. A flash suppressor, for example, not only reduces the chances that a home invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing in self-defense. DAVID B. KOPEL, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994). Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id*. at 398–99, as well as enabling safe storage of defense instruments in accessible spaces. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively. Folding and telescoping stocks also increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id*. at 398–99 26.    Pistol  grips  improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id*. at 396. Additionally, most all common semiautomatic firearms, including those banned under Delaware law, can accept a detachable magazine. Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly.

Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are

present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. GARY KLECK, MARC GERTZ, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995); *see also* ENGLISH, *National Firearms Survey*, *supra* at 5 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

Other common, lawful uses of the banned firearms are hunting and sport. At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning semiautomatic firearms like those banned by Delaware. *See Modern Sporting Rifle Comprehensive Consumer Report* and *Sport Shooting Participation in the U.S. in 2020*, *supra*.  Here again, the banned features of firearms mischaracterized as "assault weapons" serve lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks also ease carrying over long distances while hunting. Both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry. Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions. Additionally, flash suppressors promote accuracy in target shooting and hunting (especially at dawn), as well as mitigate against temporary blindness when using a firearm in self-defense.

By contrast, one use that is <u>not</u> common for so-called "assault weapons" is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes."

8

This has long been true. *See* GARY KLECK, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'"). Indeed, according to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. *See Expanded Homicide Table 8, Crime in the United States* (FBI 2019), https://bit.ly/3HdolNd.

Further, the arms banned as "assault weapons" under Delaware's laws are common in all respects: 1) They are common categorically, as they are all functionally semiautomatic in their operation; 2) they are common characteristically, as they are all popular configurations of arms (*e.g.*, rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and 3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

There is no constitutionally relevant difference between a semiautomatic handgun, shotgun, and rifle. While some exterior physical attributes may differ—wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. having muzzle devices, different barrel lengths, etc. – they are, in all relevant respects, the same. Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions. They are all common under the same jurisdictional analysis. Further, they are all subject to the same constitutionally relevant history under which Delaware's Ban is clearly and categorically unconstitutional.

9

Just like the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" is not merely wrong, but "bordering on the frivolous" (*Heller*, 554 U.S. at 582), the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (internal citations omitted). The fact that Delaware's laws may act to ban thousands of discrete configurations of common semi-automatic arms held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller* and *Bruen*.

Delaware's Ban on possessing, acquiring, manufacturing, importing, transporting, selling, purchasing, receiving, and lawfully using "assault weapons" is, therefore, a ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home. *Bruen* confirms that the Second Amendment's plain text covers the activity at issue—possession of a bearable arm. That is because, reiterating what was said in *Heller*, *Bruen* states that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id*. at 2132 (emphasis added). *Bruen* further confirms that the *Heller* Court already has conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection and therefore cannot be banned.

The arms banned as "assault weapons" under Delaware's laws are not both dangerous *and* unusual. In order for a ban of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Id*. at 2143. It follows that types of arms that are in "common use today" simply cannot be banned.

10

*Id*. These principles decide this case. Once it is determined that Delaware's laws ban arms that are in common use, it follows that the law is unconstitutional – period.

In this case, the analysis is straightforward: The Plaintiffs may not be prohibited from exercising their right to keep and bear arms. The Second Amendment's text covers the conduct the Plaintiffs wish to engage in and the arms they wish to acquire and possess. The arms the Plaintiffs wish to acquire and possess are not dangerous and unusual today. Moreover, there is no analogous history supportive of Delaware's Ban. Thus, under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs must prevail.

## II.     Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

It is well accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist*., 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971); *see also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("Infringements of this [Second Amendment] right cannot be compensated by damages."). Here, Plaintiffs face ongoing deprivations of their Second and Fourteenth Amendment rights. Each day Defendant's unconstitutional Ban continues in force, Gray, Taylor, and other ordinary law-abiding citizens who reside in Delaware, including but not limited to other members of FPC and SAF and customers of DJJAMS, risk felony prosecution, incarceration, and permanent loss of their Second Amendment rights because they possess so-called "assault weapons." These injuries cannot be compensated through money damages.

## III.     The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief

The public interest and balance of equities likewise favor Plaintiffs. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)), for "the enforcement of an unconstitutional law

11

vindicates no public interest." *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn v. Dist. of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). On the other side of the scale, Defendant suffers little harm in the event that preliminary injunctive relief is granted to Plaintiffs, and enforcement of the unconstitutional Ban cannot be outweighed by any purported public interest in any event.

**IV.     The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount**

The Third Circuit has recognized that the district court may sometimes dispense with the security requirements of Fed. R. Civ. P. 65. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). "The court should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right." *Board of Educ. v. F.C. ex rel. R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. Apr. 22, 1998). Here, where Plaintiffs seek to enforce their constitutional rights, they should not be required to post security. However, in the event that the Court determines that some bond is necessary here, any such bond should be set at a nominal amount.

**V.     The Court Should Enter Final Judgment Awarding a Permanent Injunction**

Because the claims in this case require no further factual development, permanent injunctive relief is appropriate. "[A] preliminary injunction hearing may be combined with a hearing on the merits, pursuant to Fed. R. Civ. P. 65(a)(2), if it is accompanied by notice to the parties sufficient to enable them to present all of their evidence." *DeLeon v. Susquehanna Cnty. Sch. Dist.*, 747 F.2d 149, 152 n.6 (3d Cir. 1984). Here, "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts," and thus the Court should enter final judgment in the form of permanent injunctive relief. *Wrenn*, 864 F.3d at 667.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion in its entirety and enter

an order, substantially in the form submitted herewith, preliminarily and permanently enjoining

Defendant's enforcement of the Ban created by H.B. 450.


Respectfully submitted,

Dated: November 22, 2022                    **GELLERT SCALI BUSENKELL & BROWN LLC**

                                            */s/ Bradley P. Lehman*
                                            Bradley P. Lehman (No. 5921)
                                            1201 N. Orange Street, Suite 300
                                            Wilmington, DE 19801
                                            P: (302) 425-5800
                                            E: blehman@gsbblaw.com

                                            *Attorney for Plaintiffs*


13